UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF OKLAHOMA

JANE DOE 1, et al.,                               )
                                                  )
                      Plaintiffs,                 )
                                                  )
v.                                                )        No. CIV-22-992-R
                                                  )
MOUNT SAINT MARY HIGH SCHOOL                      )
CORPORATION OF THE STATE OF                       )
OKLAHOMA, an Oklahoma corporation;                )
et al.,                                           )
                                                  )
                      Defendants                  )

## ORDER

Defendants Mount Saint Mary Corporation, the Roman Catholic Archdiocese of

Oklahoma City, and the Sisters of Mercy of the Americas South Central Community, Inc.[1]

have separately filed Motions to Dismiss [Doc. Nos. 66, 67, 68] that are now fully briefed

[Doc. Nos. 76, 77, 79, 81, 82] and at issue.

### PROCEDURAL BACKGROUND

Plaintiffs are students and the parents of students that allegedly experienced sexual

assault and harassment while attending Mount Saint Mary High School. Plaintiffs initiated

---

[1] In its brief, Sisters of Mercy notes that the entity originally named and served in this lawsuit is "Sisters of Mercy of the Americas South Central Community, Inc." but the Second Amended Complaint names the entity "Sisters of Mercy of the Americas, Inc." as the defendant. In its motion, Sisters of Mercy clarifies that its arguments are made on behalf of the entity that was originally served in this lawsuit and that it is not aware of any other entity that has been properly served. Plaintiffs' response brief offers no explanation for their failure to serve the defendant named in their Second Amended Complaint. Plaintiffs are therefore directed to show cause for their failure to serve the named defendant or move to correct the case caption if appropriate.

this action in state court and asserted several federal and state law claims against Defendants Mount Saint Mary High School Corporation ("MSM"), the Archdiocese, and Sisters of Mercy. Defendants removed the action and each moved for dismissal under Fed. R. Civ. P. 12(b)(6). The Court granted the motions, concluding that the allegations outlining the involvement of the Archdiocese and Sisters of Mercy were too conclusory to state plausible claims, the Title IX and tort claims of some plaintiffs were barred by the statute of limitations, and the allegations failed to state plausible breach of contract, public nuisance, and loss of consortium claims.

Plaintiffs then filed a motion seeking leave to file a Second Amended Complaint, which Defendants opposed on the ground of futility. The Court granted the motion in part, concluding that the proposed amended pleading stated a breach of contract claim against MSM, stated claims premised on vicarious liability against the Archdiocese and Sisters of Mercy, failed to state a claim for breach of the duty of good faith, and plausibly alleged that at least some aspects of the Title IX and tort claims were not barred by the statute of limitations. The Court also noted that any argument that the claims of a specific Plaintiff were barred by the statute of limitations would be more appropriately raised in a motion to dismiss that separately addressed the accrual and tolling standards that govern each claim and the allegations that are pertinent to each Plaintiff.

Little surprise then that after Plaintiffs filed their Second Amended Complaint, Defendants again moved for dismissal. The Second Amended Complaints asserts claims for breach of contract, negligence, intentional infliction of emotional distress, fraudulent inducement to contract, violation of Title IX of the Education Amendments of 1972, and a

claim of "intentional civil sexual abuse" against MSM's former principal, Talita DeNegri.[2]

In moving for dismissal, Defendants again contend that the claims of certain Plaintiffs are

time barred and reassert their contention that Plaintiffs have failed to state a breach of

contract claim. MSM also argues, for the first time, that various Plaintiffs have failed to

state a Title IX claim, intentional infliction of emotional distress claim, negligence claim,

or fraudulent inducement claim. Each argument is addressed in turn.

## STANDARD

To survive a motion to dismiss under Rule 12(b)(6), a pleading must contain

"enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v.

Twombly*, 550 U.S. 544 (2007). "A claim has facial plausibility when the plaintiff pleads

factual content that allows the court to draw the reasonable inference that the defendant is

liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A

complaint "does not need detailed factual allegations" to state a plausible claim, although

it does require "more than labels and conclusions." *Twombly*, 550 U.S. at 555. All well-

pleaded factual allegations are accepted as true and viewed in the light most favorable to

the plaintiff. *Lane v. Simon*, 495 F.3d 1182, 1186 (10th Cir. 2007).

---

[2] The Second Amended Complaint also contains a claim for breach of the duty of good and fair dealing. Plaintiffs' response brief indicates that they wish to dismiss this claim without prejudice. *See* Doc. No. 76 at 2 n. 1. The Second Amended Complaint also asserts a claim titled Respondeat Superior. However, Plaintiffs' response brief [Doc. No. 76, p. 35] clarifies that this is not asserted as a standalone cause of action.

## THE SECOND AMENDED COMPLAINT[3]

The Second Amended Complaint is filed on behalf of sixteen Plaintiffs who are former students (or parents of students) that attended Mount Saint Mary High School. Defendants include Mount Saint Mary High School Corporation (the entity that operates MSM); Talita DeNegri (the principal of MSM during the events at issue); and the Roman Catholic Archdiocese of Oklahoma City and Sisters of Mercy of the Americas (two separate entities that allegedly co-sponsor, own, operate, and accredit MSM). Sec. Am. Compl. ¶¶ 24, 25, 37, 79, 85, 96.

Broadly stated, the Second Amended Complaint alleges that the student Plaintiffs were sexually harassed or assaulted during their attendance at MSM, either by other students or staff. Plaintiffs further allege that sexual assault was rampant at MSM, Defendants fostered and failed to remedy the sexually hostile environment, and MSM concealed a pattern of sexual misconduct that occurred at the school. Plaintiffs attended MSM at various times between 2005-2022 but allege they were not aware that MSM was hiding a pattern of sexual assault until an investigation and media story published at the end of 2021 broke the news.

The Second Amended Complaint includes a number of collective allegations describing how MSM "fosters and perpetuates a culture of shame" and discourages students from reporting sexual assault. Sec. Am. Compl. ¶¶ 27. Plaintiffs allege that MSM

---

[3] The Second Amended Complaint is comprised of 122 pages of allegations and nearly 300 pages of exhibits. Given the length of the pleading, this section only summarizes some of the pertinent allegations in order to provide a factual background of the case. Other relevant allegations are referenced in the discussion of specific claims.

enforced its dress code policy in a discriminatory manner, made students attend "morality day" assemblies where girls (but not boys) are told they will be damaged if they engage in sexual activity, "glorified" boys who displayed stereotypical male conduct, failed to act despite knowing that teachers and coaches frequently assaulted and harassed students at the school, permitted boys to harass girls' at athletic events with no repercussions, blamed girls (but not boys) and failed to appropriately respond to students circulating sexually explicit videos, and shamed girls (but not boys) for engaging in sexual activity. *Id.* ¶¶ 274-75, 279-282, 303-05, 307, 310-16. The Second Amended Complaint also includes a number of allegations stating that MSM's staff knew of sexual misconduct occurring at the school and failed to take appropriate action. *Id.* ¶¶ 140-145, 289-90, 297-98, 300-306, 334-38, 632-33, 635-41. Relying on these allegations, the Second Amended Complaint asserts that MSM's custom of discouraging reporting, repeated failure to investigate or respond to reports of sexual assault, and fostering of a culture of shame constitutes "a policy of intentional discrimination" that "substantially increased Plaintiffs risk of being sexually assaulted…and resulted in such actions" and "created a heightened risk of sexual assault." *Id.* ¶ 156-57, 166. Plaintiffs further assert that "Defendants were deliberately indifferent to the safety of the Plaintiffs both prior to and after their individual sexual assaults." *Id.*

The Second Amended Complaint also includes numerous allegations stating that MSM's administrators misled Plaintiffs regarding the extent of misconduct occurring at the school and attempted to prevent Plaintiffs from further pursuing their reports of sexual misconduct. *Id.* ¶¶ 154, 227, 302, 330, 333, 342, 354, 364, 370, 400, 533, 542-43, 545, 552-54, 638. 668, 698. Although several Plaintiffs graduated from MSM well before the

filing of this lawsuit in 2022, they allege that MSM's concealment of its wrongdoing prevented them from discovering that there was "a pattern of sexual assaults and rapes" or that MSM's own actions "created a heightened risk that they would be subjected to sexual harassment or assault." *Id.* ¶¶ 129, 365-66, 373. Plaintiffs also allege that they did not know that other students had reported or would report similar incidents of sexual harassment and believed their own assaults were isolated incidents. *Id.* ¶¶ 368, 375, 405-406, 419, 495-97, 548-49.

In addition to these collective allegations, the Second Amended Complaint includes allegations specific to each student Plaintiff. These allegations describe the assault or harassment each student Plaintiff experienced during their school attendance as well as MSM's response:

- Jane Doe 1 alleges that she was sexually assaulted by another student at MSM in 2020. The allegations indicate that the assault resulted in a criminal prosecution against the student. The assault was reported to MSM administrators, who dismissed the students concerns as a "flirtatious" interaction, misrepresented to Jane Doe 1's guardian that the student would be suspended, and told Jane Doe 1 to use a different stairwell to avoid running into the assailant. Jane Doe 1 also alleges that her volleyball coach would make inappropriate comments about the physical appearance of parents who he found attractive, the comments were reported to MSM, MSM responded that the coach needed training but never provided the training. *Id.* ¶¶ 376-391.

- Jane Doe 3 alleges that she was assaulted by student S.L. on the bus while returning from a school athletic event, she did not immediately report the incident "based largely on the culture of shame MSM had created," the assault was eventually reported to MSM, the principal insisted that Jane Doe 3 was lying about the assault and threatened that moving forward with her report would jeopardize her future, the principal forced Jane Doe 3 to apologize to S.L. and S.L.'s father, and there were no consequences for S.L. *Id.* ¶¶ 393-404;

- Jane Doe 5 alleges that she experienced several separate incidents of sexual harassment or assault, including being asked by a former MSM student to send nude photographs, being involved in an unlawful relationship with an adult, being repeatedly sexually harassed and assaulted by student J.B., and being repeatedly sexually assaulted by student S.W. Jane Doe 5 alleges that MSM was aware of these incidents and did not take any action to stop the behavior. Jane Doe 5 also alleges that S.W. was a "known assailant who assaulted multiple women and was allowed to operate with impunity by MSM." *Id*. ¶¶ 409-420.

- Jane Doe 6 alleges that she was sexually assaulted by student X.R. while giving him a ride home from a cross-country event, she initially did not report the incident "based on MSM's culture of shame and victim blaming," the assault was eventually reported to MSM, and MSM never investigated or took any action in response. Jane Doe 6 alleges that X.R. "was at the beginning of his time at MSM when he assaulted Jane Doe 6" and he went "on to assault over a dozen girls and women, some numerous times, during his time attending MSM." *Id*. ¶¶ 422-431.

- Jane Doe 8 alleges that a coach at MSM slapped her buttocks and said "hello ladies" while she was entering a classroom, MSM administrators were told of the incident, and MSM responded by making excuses for the coach, suspending him for two weeks, and forcing Jane Doe 8 to apologize to the coach for the "miscommunication." Jane Doe 8 alleges the same coach physically assaulted another girl during a sporting event and he "continued to harass and assault young women, with little to no consequence, even after MSM was on notice of his prior assaults." *Id*. ¶¶ 432-437.

- Jane Doe 9 alleges that on multiple occasions, she accompanied a friend to report a sexual assault to MSM and MSM did nothing in response to the reports, she experienced body shaming and double standards while at MSM, she wrote a letter to MSM in 2021 describing the environment she experienced while a student, MSM's principal lied to her about her knowledge of prior rape cases at MSM, and the principal told MSM staff and community members that Jane Doe 9 is a liar and misinformed. *Id*. ¶¶ 440-50.

- Jane Doe 10 alleges that she was assaulted and repeatedly harassed by student J.B., MSM staff were aware of the conduct, MSM did nothing to stop the conduct and instead made Jane Doe 10 feel like it was her fault,

and MSM retaliated against Jane Doe 10 by blocking her admission into the National Honor Society. *Id*. ¶¶ 451-463.

- Jane Doe 12 alleges that she was assaulted numerous times by X.R., his friends, and C.J.J. She reported the incident with X.R. to MSM, and it responded by asking whether the interaction was actually flirting. Jane Doe 12 pursued criminal charges against C.J.J. and he pled no contest, but MSM took over 8 months to investigate and make a determination about the allegations involving C.J.J. Jane Doe 12 also alleges that a coach has taken videos of her and that MSM tolerates that type of behavior from its coaches and teachers. Jane Doe 12 alleges that after she complained to MSM about the sexual assault and harassment she experienced, she was retaliated against by being harassed about going to the bathroom or going to her car. *Id*. ¶¶ 466-481.

- Jane Doe 15 alleges that she was raped at a student's house after a basketball game by student P.H., her mother (Jane Doe 16) reported the rape to the MSM principal, the principal threatened Jane Doe 15 with losing her scholarship if she continued to speak about the incident, it was clear to her that MSM would protect the perpetrator, and MSM did not conduct an investigation or punish P.H. *Id*. ¶¶ 482-490.

- Jane Doe 17 alleges that she was assaulted by X.R. at MSM on multiple occasions, she "was initially afraid to report these incidents because of the culture of shame created by MSM," she eventually reported the assaults to MSM's principal who explained away the assaults and said she could not do anything even though X.R. was still a student at MSM. After reporting additional bullying by X.R., the principal told her that she needed to stop and not "ruin this poor boy's life." Jane Doe 17 also reported the assaults to the Archdiocese but it did not take appropriate action. *Id*. ¶¶ 500-518.

With that background in mind, the Court turns to the arguments raised by Defendants in support of their motions to dismiss.

## DISCUSSION

### A. Claims Against the Archdiocese and Sisters of Mercy

The Second Amended Complaint alleges that MSM is the alter ego/agent of the Archdiocese and/or the Sisters of Mercy and that these entities employ, co-sponsor, own,

operate, and accredit MSM. *Id.* ¶¶ 24, 25, 37, 71, 79, 85, 96, 104, 117, 164, 597. In its motion to dismiss, Sisters of Mercy argues that there is "insufficient evidence" that it is vicariously liable for the alleged conduct of MSM because the Sisters of Mercy is a distinct corporate entity that is shielded by its corporate structure. *See* Def.'s Br. at 2. At this stage, the relevant inquiry is not whether there is sufficient evidence to support Plaintiff's theory of liability, but whether the complaint includes a statement of the claim showing that the pleader is entitled to relief. Fed.R.Civ.P. 8(a)(2). A complaint need not contain "specific facts" or "establish a prima facie case" to meet this standard. *Id.* (quotation omitted). Instead, the complaint must only include factual content that permits "at least a 'reasonable inference'" that the defendant is liable for the alleged misconduct. *Burnett v. Mortg. Elec. Registration Sys., Inc.,* 706 F.3d 1231, 1236 (10th Cir. 2013) (quoting *Iqbal*, 556 U.S. at 678).

Under Oklahoma law, corporate distinctions may be disregarded in certain, limited situations, including when "one corporation is but an instrumentality or agent of another." *Frazier v. Bryan Mem'l Hosp. Auth.*, 775 P.2d 281, 288 (Okla. 1989). "The question whether an allegedly dominant corporation may be held liable for a subservient entity's tort hinges primarily on control." *Id.* at 288. In ruling on Plaintiffs' motion for leave to amend, the Court previously concluded that the Second Amended Complaint included allegations plausibly suggesting that the Sisters of Mercy (and the Archdiocese) exercised some level of control over MSM and/or jointly employed certain MSM staff members. The Court is not persuaded that it should revisit this conclusion. Although admittedly close, the Court finds that, accepting the allegations as true and construing them in Plaintiffs' favor,

the Second Amended Complaint advances sufficient factual content to permit a reasonable inference that Sisters of Mercy and the Archdiocese are liable for the conduct alleged, either under an alter ego/agency theory or as the employer of MSM's staff. Accordingly, Sisters of Mercy's request for dismissal of this theory of liability is denied.

The Archdiocese and Sisters of Mercy also argue that, notwithstanding any theories of vicarious liability, the Second Amended Complaint does not state any plausible claims directly against them. They contend that the Second Amended Complaint does not include any factual allegations showing that the Archdiocese or Sisters of Mercy entered into (let alone breached) a contract with Plaintiffs, defrauded Plaintiffs, intentionally inflicted emotional distress, or breached a separate duty to Plaintiffs.

The Second Amended Complaint includes numerous factual allegations directed at the acts or omissions of MSM and its staff. And, as noted above, there are sufficient allegations to raise a plausible inference that Sisters of Mercy and the Archdiocese exercised some level of control, or employed certain MSM staff, such that these entities may be liable for MSM's conduct, even though MSM, Sisters of Mercy, and the Archdiocese are separate corporate entities. However, apart from this, the Second Amended Complaint does not include sufficient factual (as opposed to conclusory) allegations regarding acts or omissions taken by the Archdiocese or Sisters of Mercy such that they could be held directly liable for Plaintiffs' contract or tort claims.[4]

---

[4] The Title IX claims are asserted only against MSM. *See* Doc. No. 77 at 2.

Start with Plaintiffs' breach of contract claim. As to the Sisters of Mercy, the Second Amended Complaint does not include any factual allegations showing that Plaintiffs entered into a contractual relationship with the Sisters of Mercy. As to the Archdiocese, the Second Amended Complaint alleges that MSM follows Archdiocesan policy with regard to matters related to sexual harassment and that Archdiocesan policy requires school employees to undergo training regarding sexual harassment. Sec. Am. Compl. ¶¶ 223-225. But neither MSM's alleged promises nor the Archdiocese's decision to require certain training for school employees plausibly suggests that the Archdiocese separately entered into a contractual relationship with Plaintiffs. *See Smalley v. Bond*, 218 P. 513, 515 (Okla. 1993) ("To constitute a valid and enforceable contract …the consent of the parties must be mutual, and consent is not mutual unless the parties all agree on the same thing at the same time."). Apart from some conclusory assertions that a contractual relationship existed between Plaintiffs and the Archdiocese and Sisters of Mercy, the Second Amended Complaint does not include factual allegations that would permit a plausible inference that these parties formed a contract and a breach of the contractual obligations occurred. *Id*. ¶¶ 559, 562. On the contrary, the Second Amended Complaint identifies the contract as "between [Plaintiffs] and the school" and alleges that MSM – not the other Defendants – made a series of promises to Plaintiffs. *Id*. ¶¶ 186, 197-203, 207, 211.

Plaintiffs' fraudulent inducement to contract and intentional infliction of emotional distress claims are similarly deficient. The Second Amended Complaint's factual allegations detail conduct taken by MSM and MSM's staff, but do not otherwise identify a statement, action, or omission taken by Sisters of Mercy or the Archdiocese that could

form the basis of these claims. Further, Plaintiffs' response brief fails to develop any argument as to why their allegations are sufficient to state a claim against the Archdiocese or Sisters of Mercy directly for intentional infliction of emotional distress or fraudulent concealment.

Plaintiffs' negligence claim is premised on an alleged duty to properly hire, train, and supervise staff at MSM and ensure the campus is safe. Their factual allegations indicate that they complained to MSM's principal and other staff members about sexual misconduct, MSM's principal and staff failed to respond, and MSM failed to enforce certain policies. But the allegations do not indicate that they complained to anyone outside of MSM about the sexual misconduct, the principal's inadequate response, or the failure to follow certain policies.[5] Plaintiffs allege numerous acts and omissions by MSM but do not separately identify acts or omissions by the Archdiocese or Sisters of Mercy. Thus, to the extent Plaintiffs assert their negligence claim against the Archdiocese and Sisters of Mercy outside of their claim that these entities are vicariously liable as the employers or alter ego of MSM, the Second Amended Complaint fails to state a plausible negligence claim.

### B. Claims Against MSM

In contrast to their claims against the Archdiocese and Sisters of Mercy, Plaintiffs have included numerous factual allegations describing acts or omissions of MSM and its

---

[5] The exception is Jane Doe 17, who alleges that after MSM failed to adequately respond to her report of sexual assault, she told a person associated with the Archdiocese, he referred her to a third party to discuss her allegations, she met with the third party, and she did not receive any follow up. Sec. Am. Compl. ¶¶ 513-515. Jane Doe 17 does not define precisely what the Archdiocese did wrong and her limited allegations are not sufficient to plausibly allege that the Archdiocese is directly liable for her negligence claims.

staff members. MSM seeks dismissal of Plaintiffs' contract, tort, and Title IX claims for failure to state a claim and further contends that some of these claims are time barred. The Court will address the sufficiency of the allegations before turning to the timeliness arguments.

### 1. Breach of Contract Claim

The Second Amended Complaint asserts that MSM entered into a contract with the students (and parents of students) via its Student Handbook, Tuition Agreement, and other documents and then breached its contractual promises by failing to provide a safe educational experience and not enforcing certain policies that govern reports of sexual harassment. MSM argues that the MSM handbook and other policies do not create a binding contract between the parties or contain contractually enforceable promises.

Oklahoma courts have recognized that a private school's written enrollment contract and the schools' alleged violation of its own procedures can form the basis of a legally cognizable breach of contract claim. In *Bittle v. Oklahoma City Univ.*, 6 P.3d 509, 514 (Okla. Civ. App. 2000), the Oklahoma Court of Civil Appeals indicated that "an educational institution's brochures, policy manuals and other advertisements may form the basis of a legally cognizable contractual relationship between the institution and its students." However, to imply a contractual agreement under those circumstances, the plaintiff must point to "some specific, identifiable agreement for an educational institution's provision of particular services to its students and an arguable breach of that specific agreement." *Id*. Subsequently, in *Gens v. Casady Sch.*, 177 P.3d 565, 570 (Okla. 2008), the Oklahoma Supreme Court held that the plaintiff, a parent of a student that had

allegedly been wrongfully dismissed from a private school, sufficiently stated a breach of contract claim where she alleged the school's "Enrollment Contract and Tuition Payment Agreement" formed a written contract between the parties and the school's actions violated the procedures set out in the school handbook. *Id*. at 568 n.2, 570.[6] As noted in the order granting Plaintiffs' motion for leave to amend, the allegations in the Second Amended Complaint are more like those in *Gens* than *Bittle*. Plaintiffs have alleged the existence of an express contract between the parties and identified specific ways that MSM allegedly breached the contract. Construing the allegations in their favor, Plaintiffs have stated a plausible claim for breach of contract against MSM.

### 2. Fraudulent Inducement to Contract Claim

The Second Amended Complaint asserts a claim for fraud/fraudulent inducement to contract based on allegations that MSM, and specifically its principal Talita DeNegri, falsely represented that MSM was a safe campus and that MSM enforced policies on sexual assault. Plaintiffs further allege that they each relied on these representations in deciding to attend MSM. Sec. Am. Compl. ¶¶ 686-724.

MSM contends that the Second Amended Complaint fails to state a claim for fraudulent inducement to contract and raises two separate arguments: First, Plaintiffs do not plead the fraud claim with particularity as required by Fed. R. Civ P. 9(b) and second, Plaintiffs do not allege conduct or damages that are distinct from the breach of contract

---

[6] Although *Gens* was decided under Oklahoma's notice pleading standards, the decision is nevertheless instructive as to whether the documents identified by Plaintiff can form the basis of a breach of contract claim under Oklahoma law

claim. *See Brown v. Elephant Talk Commc'ns Corp.*, No. CIV-18-00902-PRW, 2020 WL 7220793, at *8 (W.D. Okla. Dec. 7, 2020) ("Under Oklahoma law, to assert simultaneously a claim for fraud and a claim for breach of contract, the claims must be distinct."). Plaintiffs do not offer any response to these arguments and MSM's motion with respect to this claim is therefore deemed confessed. *See* LCvR7.1; *Bowdish v. Fed. Express Corp.*, 699 F. Supp. 2d 1306, 1326 (W.D. Okla. 2010) (deeming issue confessed where response brief failed to address it).

### 3. Intentional Infliction of Emotional Distress Claim

MSM next argues that Plaintiffs have failed to plausibly state a claim for intentional infliction of emotional distress because they have not alleged extreme and outrageous conduct. To maintain a claim for intentional infliction of emotional distress, Oklahoma law requires, amongst other elements, "proof that the defendant's conduct was so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and that such conduct is regarded as atrocious and utterly intolerable in a civilized community." *Computer Publications, Inc. v. Welton*, 49 P.3d 732, 735 (Okla. 2002). This is a difficult standard to meet and conduct that "amounts to no more than mere insults, indignities, or petty oppressions" will not suffice. *Daemi v. Church's Fried Chicken, Inc.*, 931 F.2d 1379, 1388 (10th Cir. 1991).

The Second Amended Complaint alleges that MSM, through its principal and other staff members, engaged in a multi-year endeavor to cover up rampant sexual assault occurring in the school community, including by blaming the girls that reported assaults, accusing them of fabricating the allegations, and/or misleading them about relevant facts.

For example, Jane Doe 1 alleges that she was sexually assaulted by another student at school and the student was eventually criminally charged for the conduct. However, MSM misled Jane Doe 1's guardian about the student's presence on campus and took no action to protect Jane Doe 1. Sec. Am. Compl ¶¶ 376-391. Jane Doe 3 alleges that she was sexually assaulted on a school bus by another student, that MSM accused Jane Doe 3 of lying about the incident because she was ashamed that she had done something impure, and that MSM made her apologize to the student and the student's father. *Id.* at ¶¶ 392-407. Jane Doe 6 alleges that she was sexually assaulted by a student while driving home from a school athletic event, MSM took no action after Jane Doe 6 reported the assault, and the student went on to sexually assault over a dozen students, including Jane Doe 12. *Id.* at ¶¶ 422-431. Jane Doe 12 alleges that when she reported the sexual assault, MSM did not take her allegations seriously and retaliated against her. Similarly, Jane Doe 5 and Jane Doe 10 allege that they were sexually harassed by the same student, they both reported the harassment to MSM, and MSM told Jane Doe 5 to "deal with it" and shamed Jane Doe 10 for reporting the conduct. *Id.* at ¶¶ 408-421; 451-465. MSM does not address the sufficiency of the allegations with respect to each Plaintiff. Regardless, considering the entirety of the factual allegations, and construing them in Plaintiffs' favor, the Second Amended Complaint includes sufficient factual content to raise a plausible inference that MSM's actions were extreme and outrageous such that dismissal at the pleading stage is not warranted.

MSM also argues that Jane Does 3, 5, 6, 8, 10, 12, 15 and 17 failed to plausibly allege that they experienced extreme emotional distress. To succeed on a claim for

intentional infliction of emotional distress under Oklahoma law, the plaintiff must show that the defendant's conduct caused severe emotional distress. *Welton*, 49 P.3d at 735. This element of the claim

> requires proof that the emotional distress suffered by the plaintiff was so severe that no reasonable person could be expected to endure it. While emotional distress includes all highly unpleasant mental reactions, such as fright, horror, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment, worry, and nausea, it is only where the emotional distress is extreme that liability arises. The intensity and duration of the distress are factors to be considered in determining its severity. Severe distress must be proved; but in many cases the extreme and outrageous character of the defendant's conduct is in itself important evidence that the distress has existed.

*Id.* at 736 (quotation marks, citations, brackets, and ellipses omitted).

In *Mengert v. United States*, 120 F.4th 696, 713 (10th Cir. 2024), the Tenth Circuit recently considered whether a plaintiff had plausibly alleged severe emotional distress. The plaintiff asserted a claim for intentional infliction of emotional distress under Oklahoma law based on an invasive search performed by security officers at the airport. *Id.* at 701. In her complaint, she alleged that she experienced "recurrent, distressing memories of the incident; symptoms of a panic attack when thinking about the incident,…and severe shaking when reminded of the incident" and that "these symptoms are so unpleasant that she avoids thinking about the incident or discussing it with others." *Id.* at 714. The Tenth Circuit held that these "allegations make clear that [the plaintiff] has experienced emotional distress as a result of her experience" but that "her distress, as alleged, is not sufficiently severe to sustain an IIED claim under Oklahoma law." *Id.*

In reaching this conclusion, the Tenth Circuit explained that "factors for determining whether emotional distress is sufficiently severe include: whether the plaintiff experienced physical symptoms as a result of the distress; whether the plaintiff sought medical attention for either physical symptoms or the emotional distress itself; and whether the distress caused a disruption to the plaintiff's daily affairs." *Id.* at 712. The Tenth Circuit then noted that although the plaintiff alleged that her distress caused physical symptoms, she had not sought medical treatment or alleged that the symptoms disrupted her daily affairs. *Id.* at 714.

Like in *Mengart*, Jane Does 3, 5, 6, 8, 10 and 17 have failed to plausibly allege that MSM's conduct caused them to experience severe emotional distress. The pertinent factual allegations of these Plaintiffs are listed below:

- Jane Doe 3: she felt "ashamed and embarrassed" as if the sexual assault was "her fault, based largely on the culture of shame MSM had created"; MSM's principal convinced her that she should be ashamed, and Jane Doe 3 understood that speaking further about the assault would result in "an adverse impact on her future including economic harm." Sec. Am. Compl. ¶¶ 395, 400, 401.

- Jane Doe 5: Nothing ever came of her reports of the various sexual assault she experienced and on one occasion MSM's principal was told "she just needed to 'deal with it' and that 'boys will be boys.'" *Id.* at ¶¶ 412, 415, 418.

- Jane Doe 6: she did not initially report the sexual assault "based on MSM's culture of shame and victim blaming," nothing happened when she did report the assault, and her assailant went on to assault multiple other students. *Id.* at ¶¶ 427, 430.

- Jane Doe 8: after she reported that a coach at MSM sexually assaulted her, MSM made excuses for the coach, the coach refused to take responsibility, and she was made to apologize for the "miscommunication." *Id.* at ¶¶435-38.

- Jane Doe 10: MSM's principal dismissed her report of being subjected to sexual assault, shamed and blamed her, and retaliated against her. *Id.* at ¶¶ 458, 461, 464.

- Jane Doe 17: she was "afraid to report [the sexual assaults] because of the culture of shame created by MSM" and the "[t]he silencing, threats and intimidation of victims prevented her from feeling safe and secure while attending school." *Id.* at ¶¶ 504, 518.

Jane Does 3, 5, 6, 8, 10, and 17 indicate that they felt shame, embarrassment, or did not feel safe. They have not, however, included any factual allegations showing that they had physical symptoms, sought medical treatment, had a disruption to their daily affairs, or otherwise experienced emotional distress that "was so severe that no reasonable person could be expected to endure it." *Welton*, 49 P.3d at 736.

The Court reaches a different conclusion with respect to Jane Does 12 and 15. Jane Doe 12 alleges that as a result of Defendants' actions, she experienced panic attacks and night terrors, sought therapy for the distress, her grades suffered, and she transferred to a different high school. *Id.* at ¶¶ 473-74. These allegations indicate that Jane Doe 12's distress was severe enough to seek medical treatment and to cause a disruption in her education. Construed in her favor, Jane Doe 12 has plausibly alleged that she experienced severe emotional distress.

Jane Doe 15 alleges that she became isolated, lost friendships, transferred to a different school, and eventually dropped out of school after she was raped and MSM chose not to investigate the incident. *Id.* at 494. Although Jane Doe 15 has not indicated that she experienced physical symptoms or sought medical treatment for her distress, her allegations plausibly show that the distress caused a significant disruption in her daily

19

affairs. Again, construed in her favor, these allegations are sufficient, at this stage, to raise a plausible inference that she experienced severe emotional distress. *See Durham v. McDonald's Restaurants of Oklahoma, Inc.*, 256 P.3d 64, 68 (Okla. 2011) (finding evidence that teenage plaintiff became withdrawn and reclusive, "wouldn't go outside, slept all day and had to be home schooled," sufficient to survive summary judgment).

The Court therefore concludes that Jane Does 3, 5, 6, 8, 10, and 17 have failed to state a claim for intentional infliction of emotional distress.[7]

### 4. Negligence

MSM argues that Plaintiffs have failed to state a claim for negligence because MSM does not have a duty to protect students from the actions of other students or third parties. Generally, under Oklahoma law, a person does not have "a duty to anticipate and prevent the intentional or criminal acts of a third party, absent special circumstances." *J.S. v. Harris*, 227 P.3d 1089, 1094 (Okla. Civ. App. 2009). In *Harris*, the Oklahoma Court of Civil Appeals explained when "special circumstances" might impose a duty for the acts of a third party:

> A reading of these decisions reveals that Oklahoma recognizes the imposition of a duty on a person for the acts of a third person who injures another under circumstances where that person has a special responsibility toward the injured party, or where the person's own affirmative act created an unreasonably high risk that harm would occur to the injured party. They also reveal that Oklahoma recognizes that such a person may have a duty to the injured party where a special relationship exists between that person and

---

[7] For reasons that are not apparent, MSM has not moved to dismiss the intentional infliction of emotional distress claims asserted by Jane Doe 1 or Jane Doe 9 based on a failure to allege severe emotional distress. However, the Archdiocese has raised the issue with respect to Jane Doe 9 and as explained below in part B(6), Jane Doe 9 has failed to state a plausible claim for intentional infliction of emotional distress.

the third person either because that person has special knowledge about the third person and control over that third person; or that person has control over some matter relative to that third person; or because of special circumstances that reasonably give notice to that person relative to a third person. Moreover, it is for the court to decide as a matter of law whether such a "special relationship" exists between the defendant and the injured party, or the defendant and a third person who inflicts harm on the injured party. In all of these cases, foreseeability of the harm to the injured party is critical.

*Id.* at 1094 (footnote omitted). Applying these principles, Oklahoma courts have held that a school district owed a duty to a student to prevent injury from another student while riding on a school bus, *Cooper v. Millwood Indep. Sch. Dist. No. 37*, 887 P.2d 1370, 1372-74 (Okla. Civ. App. 1994), and that a school district owed a "general duty" to protect a student from intentional harm by a third party if the school has the ability to control the conduct and knows of the need to exercise such control. *J.W. v. Indep. Sch. Dist. No. 10 of Dewey Cnty.*, 500 P.3d 649, 666 (Okla. Civ. App. 2021).

MSM does not address the specifics of each Plaintiffs' allegations, but at least some Plaintiffs allege that they were assaulted while at school or school events and that the school had prior knowledge of the alleged perpetrator's history of sexual misconduct. *See,* Sec. Am. Compl. ¶¶ 413-419, 451-466, 466-481, 500-517. Moreover, some Plaintiffs allege that their assailants were teachers and coaches of MSM. *Id.* ¶¶ 432-38, 471. Given those allegations and the Oklahoma law cited above, the Court is not persuaded, based on the arguments presented, that MSM did not owe a duty to protect students from the actions of third parties as a matter of law.[8]

---

[8] In arguing otherwise, MSM cites to *Graham v. Indep. Sch. Dist. No. I-89*, 22 F.3d 991, 993-95 (10th Cir. 1994), for the proposition that schools have no affirmative duty to protect students from assault by other students and that school districts do not enter a "custodial

As a separate argument, MSM contends that Plaintiffs' have failed to state a claim for negligence per se. A claim for negligence per se is based on a violation of a duty imposed by statute. *Busby v. Quail Creek Golf & Country Club*, 885 P.2d 1326, 1329 (Okla. 1994). "To establish negligence per se on the basis of a statutory violation the party must establish that: 1) the injury was caused by the violation; 2) the injury was of a type intended to be prevented by the statute; and 3) the injured party was of the class meant to be protected by the statute." *Id.* The Second Amended Complaint contends that Defendants are liable on a per se basis because their actions constitute a violation of criminal law and cite to Okla. Stat. tit. 21, § 843.5 and Okla. Stat. tit. 70, §§ 1210.163; 24-100.2. MSM contends that the negligence per se claim fails because these statutes either do not create a private right of action or do not apply to a private school like MSM. Plaintiffs offer no response to these arguments and the issue is therefore deemed confessed. *See* LCvR7.1(g).

### 5. Title IX Claims

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). The Tenth Circuit has described a claim for violation of Title IX as including four components:

---

relationship" with its students. The specific issue in *Graham* was whether a school district had a constitutional duty under the Fourteenth Amendment to protect students from the actions of third parties. *Id. Graham* was not a negligence case and did not apply Oklahoma law. Accordingly, the Court is not persuaded that *Graham* necessarily forecloses Plaintiffs' negligence claim.

> In sum, a plaintiff must allege four factors to state a claim of school district liability under Title IX. She must allege that the district (1) had actual knowledge of, and (2) was deliberately indifferent to (3) harassment that was so severe, pervasive and objectively offensive that it (4) deprived the victim of access to the educational benefits or opportunities provided by the school.

*Murrell v. Sch. Dist. No. 1, Denver*, 186 F.3d 1238, 1246 (10th Cir. 1999). With those factors as its guide, MSM argues that Plaintiffs' Title IX claims are deficient in a number of ways, and each is addressed in turn.

### a. Denial of Educational Benefit or Opportunities

MSM first argues that the Title IX claims of all Plaintiffs fail because the Second Amended Complaint does not adequately allege the fourth factor – deprivation of educational benefits and opportunities.

The Supreme Court discussed this component of a Title IX claim in *Davis. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 650 (1999). *Davis* held that "student-on-student sexual harassment, if sufficiently severe, can [] rise to the level of discrimination actionable under the statute." *Id.* In reaching this holding, the Court was careful to note that "simple acts of teasing and name-calling among school children" are not sufficient to make out a claim under Title IX. *Id.* at 651-52. "Rather," the Court concluded, "a plaintiff must establish sexual harassment of students that is so severe, pervasive, and objectively offensive, and that so undermines and detracts from the victims' educational experience, that the victim-students are effectively denied equal access to an institution's resources and opportunities." *Id.* at 651. Whether conduct rises to this level "depends on a constellation of surrounding circumstances, expectations, and relationships," including "[t]he

relationship between the harasser and the victim." *Id.* at 651-53 (quotation omitted). The behavior must "be serious enough to have the systemic effect of denying the victim equal access to an educational program or activity." *Id.* at 652.

In setting out this standard, the Supreme Court also noted that although alleging a "mere decline in grades" is not enough to survive a motion to dismiss, a plaintiff's "ability to state a cognizable claim" under Title IX "depends equally on the alleged persistence and severity of [the harasser's] actions, not to mention the [school's] alleged knowledge and deliberate indifference." *Id.* at 652. Thus, the plaintiff in *Davis* stated a Title IX claim based on peer-on-peer harassment where the complaint alleged repeated acts of verbal and physical harassment over a five-month period, multiple victims that complained to the principal, and harassment that "had a concrete, negative effect on [the plaintiff's] ability to receive an education." *Id.* at 653-54.[9]

In *Farmer v. Kansas State Univ.,* 918 F.3d 1094, 1104 (10th Cir. 2019), the Tenth Circuit relied on *Davis* to conclude that, in the context of a post-assault claim, a plaintiff "can state a viable Title IX claim for student-on-student harassment by alleging that the funding recipient's deliberate indifference caused them to be 'vulnerable to' further harassment without requiring an allegation of subsequent actual sexual harassment." But *Farmer* makes clear that a plaintiff must still allege that the vulnerability to further harassment somehow deprived them of educational benefits or opportunities. *Id.* at 1104-05, 1109. The plaintiffs in *Farmer* met that burden by "alleging that the fear of running

---

[9] *Davis* was decided prior to the Supreme Court refining the pleading standard in *Twombly* and *Iqbal*.

into their student-rapists caused them, among other things, to struggle in school, lose a scholarship, withdraw from activities [the school] offers its students, and avoid going anywhere on campus without being accompanied by friends or sorority sisters." *Id.* at 1105.

Turning to the allegations in this case, MSM contends that Plaintiffs have failed to include factual content showing that the discrimination, hostile educational environment, or inadequate response to prior reports of sexual harassment denied Plaintiffs' equal access to educational benefits and opportunities. MSM does not address the specific allegations made by each Plaintiff but instead broadly contends that Plaintiffs do not include "any factual support" to show they were deprived of educational benefits. In the Court's view, that is not an accurate description of the allegations in the Second Amended Complaint.

The Second Amended Complaint alleges that Plaintiffs were subjected to threats by MSM to withdraw scholarship funds or interfere with graduation and college admissions. Sec. Am. Compl. ¶ 370. They also allege that "they were constantly exposed to potential encounters with their harassers and/or assailants" because MSM allowed assailants to remain at the school. *Id*. at ¶ 308. Moreover, the Second Amended Complaint alleges that several Plaintiffs were subjected to additional instances of assault or harassment after misconduct was reported to MSM. *Id*. ¶¶ 412-416, 452-455, 467-68, 500-503. Although these allegations may not speak directly to how their education was affected, the "persistence and severity" of the harassment as well as the school's "alleged knowledge and deliberate indifference" at least colors the analysis of whether Plaintiffs have plausibly alleged a denial of equal access to educational benefits. *Davis*, 526 U.S. at 652.

Additionally, several specific Plaintiffs include allegations sufficient to permit a

25

plausible inference that they were "effectively denied equal access to an institution's resources and opportunities. *Davis*, 526 U.S. at 651. For example, Jane Doe 5 and Jane Doe 10 both allege that they were subjected to repeated sexual misconduct by another student while participating in a school extracurricular activity. The misconduct included physical assault, masturbating in front of them, watching pornography, and other lewd acts and became so frequent that it happened on nearly every occasion the group was together. They further allege that MSM was aware of the conduct and told Plaintiffs to "deal with it." *Id.* ¶¶ 413-416, 453-455. In a somewhat similar vein, Jane Doe 17 alleges that she was repeatedly physically assaulted by another student, MSM had knowledge of the conduct, the student assailant continued to bully and threaten Jane Doe 17, and that MSM's failure to respond prevented her from feeling safe and secure at school. *Id.* at ¶¶ 288, 500-518. Requiring students who wish to participate in a school activity to be exposed to frequent instances of sexual assault, harassment, and other misconduct plausibly shows, at this early stage, that the students were effectively being denied equal access to MSM's resources and opportunities.

Further, some Plaintiffs have alleged that MSM's inappropriate response caused them to avoid certain areas of school or leave school altogether. Jane Doe 1 – who complained of an assault by another student that occurred at school – alleges that she was under constant fear of running into her assailant, avoided certain areas of campus, her grades fell, and she was unfairly prevented from playing on the volleyball team. Sec. Am. Compl. ¶¶ 383-386. Jane Doe 12 and Jane Doe 15 both allege they transferred to a different school following MSM's failure to respond to their reported assaults. *Id.* ¶¶ 473-474, 494.

Allegations showing that a plaintiff avoided areas of campus or transferred schools altogether are sufficient to state a plausible Title IX claim. *See Farmer*, 918 F.3d at 1105 (noting that a plaintiff's "objectively reasonable fear of running into an assailant," struggles in school, and withdrawing from school are all pertinent to whether a Title IX plaintiff can survive a motion to dismiss); *Bynum as next friend of M. B. v. Indep. Sch. Dist. No. 1 of Kiowa Cnty. Oklahoma*, No. CIV-23-1003-PRW, 2024 WL 4343051, at *3 (W.D. Okla. Sept. 27, 2024) (finding that a plaintiff plausibly alleged a denial of equal access because he "left the district entirely due to the harassment and retaliation.").

Admittedly, some Plaintiffs' allegations as to this element of their Title IX claim are on the sparse side. Sec. Am. Compl. ¶¶ 144, 150. Nevertheless, MSM's argument on this point is not persuasive, particularly given MSM's failure to address the specific allegations of each Plaintiff. Considering the allegations as a whole, and drawing reasonable inference in Plaintiffs' favor, the Second Amended Complaint includes sufficient factual content to nudge this aspect of the Title IX claim across the line from conceivable to plausible.[10]

### b. Clearly Unreasonable Response to Misconduct

MSM argues that Jane Does 1 and 8 have not plausibly alleged a pre-assault Title IX claim because their allegations show that MSM's response to the reported misconduct was not clearly unreasonable. As previously noted, a Title IX claim generally requires showing that a funding recipient was "deliberately indifferent" to sexual harassment. *Rost*

---

[10] The claims asserted by Jane Doe 9 are addressed separately in section B(6).

*ex rel. K.C. v. Steamboat Springs RE-2 Sch. Dist.*, 511 F.3d 1114, 1119 (10th Cir. 2008). A recipient is deliberately indifferent to acts of harassment "only where the recipient's response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." *Davis*, 526 U.S. at 658. Under this standard, school administrators are not required to eliminate all harassment or engage in any particular form of disciplinary action. *Id.* Although this is generally a high bar to meet, merely providing a "minimal" response is not a reasonable response. *Escue v. N. OK Coll.*, 450 F.3d 1146, 1155 (10th Cir. 2006).

Jane Doe 1 alleges that she was assaulted in a school hallway, portions of the assault were caught on security videos, and the assault led to criminal charges against the student. MSM responded by allegedly telling Jane Doe 1 that her assailant was merely being flirtatious, permitting the assailant to return to school the next day (and lying to Jane Doe 1's guardian about it), and telling Jane Doe 1 to avoid areas of campus. Sec. Am. Compl. ¶¶ 376-391. Construed in her favor, these allegations raise a plausible inference that MSM – by downplaying the assault and seemingly not taking any disciplinary action against the assailant – acted in a manner that was clearly unreasonable.

Jane Doe 8 alleges that a coach at MSM slapped her buttocks as she was walking into a classroom. This same coach allegedly harassed or assaulted other students. *Id.* at ¶¶ 305, 438. After reporting the incident, MSM's principal spoke to the coach, suspended him for two weeks, and then allowed him to return. *Id.* at 435. However, the principal also allegedly called Jane Doe 8 into a meeting with the coach where she was gaslit and forced to apologize to the coach for the "miscommunication." *Id.* ¶ 436-37. Although suspending the coach certainly suggests that MSM's response to Jane Doe 8's report was more than

minimal, the other allegations are sufficient, at this stage, to preclude a finding that MSM's response was not clearly unreasonable, particularly given the allegations suggesting that MSM was aware of other misconduct by this same coach.

### c. Conduct Subject to MSM's Control

MSM next argues that the pre-assault Title IX claims asserted by Jane Does 5, 6, and 15 fail to state a claim because they have not adequately alleged that MSM had substantial control over the context in which the harassment occurred. Title IX's statutory language "limit[s] a recipient's damages liability to circumstances wherein the recipient exercises substantial control over both the harasser and the context in which the known harassment occurs." *Davis*, 526 U.S. at 644. Harassment that "occurs during school hours and on school grounds" generally meets these requirements. *Id.* at 646. Harassment that occurs off school grounds may also form the basis of a Title IX claim, but "there must be some nexus between the out-of-school conduct and the school." *Rost*, 511 F.3d at 1122.

In *Simpson v. Univ. of Colorado Boulder*, 500 F.3d 1170, 1173 (10th Cir. 2007), the Tenth Circuit reversed a grant of summary judgment to the defendant university and permitted Title IX claims involving sexual assaults committed by students and non-students at a private residence to proceed to trial. The plaintiffs in *Simpson* were assaulted in connection with a football recruiting visit and alleged that the assaults were the consequence of the university's recruitment program, which included an "officially sanctioned but unsupervised effort to show recruits a 'good time.'" *Id.* at 1175. The Tenth Circuit found these allegations distinguishable from prior Title IX cases because there was

an "element of encouragement of the misconduct by the school" and proceeded to evaluate it under an official-policy framework. *Id.* at 1177-78. The Court concluded:

> that a funding recipient can be said to have intentionally acted in clear violation of Title IX, when the violation is caused by official policy, which may be a policy of deliberate indifference to providing adequate training or guidance that is obviously necessary for implementation of a specific program or policy of the recipient. Implementation of an official policy can certainly be a circumstance in which the recipient exercises significant control over the harasser and the environment in which the harassment occurs.

*Id.* at 1178 (internal quotation marks and citations omitted).

Here, Plaintiffs are premising their pre-assault claim, at least in part, on MSM's alleged "policy of discouraging and penalizing reporting, failing to investigate and/or punishing assailants…that substantially increased Plaintiffs' risk of being sexually assaulted on campus, off campus with their school mates and/or at school and church related functions." Sec. Am. Compl. ¶ 156. Under *Simpson*, implementation of a specific policy is a circumstance in which the school may exercise substantial control, even where harassment occurs off campus. The Court is reluctant to read *Simpson*, which involved a specific program as opposed to a campus wide policy, too broadly. Nevertheless, given *Simpson's* holding, the Court is not persuaded by MSM's argument that the Title IX claims fail merely because some of the harassment occurred off campus.

Additionally, and significantly, Jane Does 5, 6, and 15 each allege that they were assaulted by a MSM student during or shortly after a school activity.[11] This suggests that

---

[11] In fact, Jane Doe 5 alleges that she was assaulted by a student during a school sponsored activity. MSM does not explain why these allegations are insufficient to show control over the harasser and context in which the harassment occurred. Jane Doe 6 alleges that she was

MSM exercised disciplinary authority, and thus some level of control, over the assailant and that there is some nexus between MSM and the assault. *Davis,* 526 U.S. at 646-7 ("We thus conclude that recipients of federal funding may be liable for subjecting their students to discrimination where the recipient is deliberately indifferent to known acts of student-on-student sexual harassment and the harasser is under the school's disciplinary authority."). Plaintiffs' allegations are sufficient at this stage to allow their claims to proceed past the pleading stage.

### d.  Official Decision Not to Remedy Misconduct

MSM next challenges Jane Doe 12's pre-assault claim on the ground that she has not adequately alleged that MSM had actual knowledge of the harassment. Title IX "imposes liability only if the district remains deliberately indifferent to acts of harassment of which it has actual knowledge." *Murrell v. Sch. Dist. No. 1, Denver*, 186 F.3d 1238, 1246 (10th Cir. 1999). "That standard makes a school district liable only where it has made a conscious decision to permit sex discrimination in its programs and precludes liability where the school district could not have remedied the harassment because it had no knowledge thereof or had no authority to respond to the harassment." *Id.* Meeting this standard often involves demonstrating that a school had actual notice of prior complaints

---

assaulted by another student while giving him a ride home from a school sporting event over the summer. MSM was allegedly on notice that this particular student had assaulted or raped numerous women. *Id.* ¶¶ 288-89, 423, 430. Jane Doe 15 alleges that she was raped by a student at a private residence after they left a school basketball game together. Jane Doe 15's allegations are more attenuated as she does not allege that MSM had knowledge of other complaints regarding the assailant. Nevertheless, the Court concludes that the allegations are sufficient to survive a motion to dismiss.

regarding a specific harasser and failed to adequately respond to those complaints. *See Escue*, 450 F.3d at 1153. But where the Title IX violation is allegedly caused by an official school policy, the same notice standards do not necessarily apply, "although the underlying principle—liability only for intentional acts by the institution itself—remains the same." *Simpson*, 500 F.3d at 1177-78.

Jane Doe 12 alleges that she was assaulted numerous times by student X.R. and was also assaulted by student C.J.J. The Second Amended Complaint also alleges that MSM's principal and other administrators knew that X.R. had assaulted other students, including some of the Plaintiffs in this action, and failed to respond appropriately. Sec. Am. Compl. ¶¶ 288, 428, 430, 467. Contrary to MSM's argument, these allegations, construed in Jane Doe 12's favor, are sufficient to raise a plausible inference that MSM's administrators had actual notice of prior complaints concerning X.R. and failed to adequately respond.

### e. Retaliation Claims

MSM argues that Jane Does 1, 10, and 12 have not stated plausible claims for retaliation under Title IX. "Title IX [] prohibits retaliation against individuals because they have complained of sex discrimination." *Hiatt v. Colorado Seminary*, 858 F.3d 1307, 1315 (10th Cir. 2017). To state a claim for retaliation under Title IX, a plaintiff must allege that the defendant "retaliated against him *because* he complained of sex discrimination." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 184 (2005). This generally requires a plaintiff to allege that "1) he or she engaged in protected activity; 2) defendant had knowledge of the protected activity; 3) materially adverse school-related action was taken against plaintiff; and 4) there was a causal connection between the protected activity and

the adverse action." *Tackett v. Univ. of Kansas*, 234 F. Supp. 3d 1100, 1109 (D. Kan. 2017). *See also Hiatt v. Colorado Seminary,* 858 F.3d 1307, 1315-16, n.8 (10th Cir. 2017) (applying burden shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1973) to Title IX retaliation claim and explaining that "a plaintiff must first establish a prima facie case for discrimination or retaliation by showing an employer took adverse employment action against the plaintiff based on the plaintiff's sex or protected activity").

MSM contends Jane Does 1, 10, and 12 have not adequately alleged an adverse school-related action. In the context of a retaliation claim, an adverse action is one that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Hiatt*, 858 F.3d at 1361 (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)). "The action must be materially adverse 'to separate significant from trivial harms,' such as 'petty slights, minor annoyances, and simple lack of good manners....'". *Id.* (quoting *Burlington*, 548 U.S. at 68). "Whether an action is materially adverse is judged from an objective standpoint." *C.H. v. Howard*, No. CV 21-574 GBW/JHR, 2023 WL 7279329, at *7 (D.N.M. Nov. 3, 2023). Further, the context in which the action is taken must be considered "because an act that would be immaterial in some situations is material in others." *Id.* (quotation omitted).

Here, drawing inferences in their favor, Plaintiffs' have alleged sufficient facts to plausibly state a claim for retaliation under Title IX. Jane Doe 1 alleges that "her volleyball jersey was taken away and she was prevented from playing in the Regional and State tournaments, purportedly based on her GPA, which fell because of the severe emotional

distress she was under" and that her coach disclosed her GPA to the volleyball team. Sec. Am. Compl. ¶ 387. She further alleges that the coach was a friend of her assailant's father, and this policy had not previously been implemented. These allegations, taken as true and construed in Plaintiff's favor, permit an inference that Jane Doe 1 was prevented from playing volleyball based on her report of sexual assault and not merely her falling GPA. *See Tackett*, 234 F. Supp. 3d at 1109 (finding adverse action against student sufficiently alleged where she was denied "the opportunity to participate in winter training"); *Higgins v. Saavedra*, No. CIV 17-0234 RB/LF, 2018 WL 327241, at *9 (D.N.M. Jan. 8, 2018) (finding adverse action where coach demoted student from cheerleading squad and school official obstructed student's transfer out of school).

Jane Doe 10 alleges MSM's principal blocked her admission into the National Honor Society and called her into the office under pretextual reasons after she reported her sexual assault. Sec. Am. Compl. ¶ 464. Preventing a student from accessing academic benefits and awards after a complaint of sexual assault is sufficient to plausibly show that a materially adverse action was taken in response to the report. *See Burlington,* 548 U.S. at 69 (action that significantly impacts employee's professional advancement can be materially adverse).

Jane Does 12 alleges that after she reported her sexual assault, she was "harassed about going to the bathroom or going to her car to get something during school, even after asking permission." Sec. Am. Compl. ¶ 472. The reasonable inference to be drawn from these allegations is that Jane Doe 12 was harassed by MSM staff and that it happened on more than one occasion. Although close, an adult staff member repeatedly harassing a high

school student for conducting normal daily activities could plausibly be construed as conduct that would dissuade a reasonable person from reporting sexual harassment as opposed to simply a minor annoyance.

### 6. Claims asserted by Jane Doe 9

The Archdiocese argues that Jane Doe 9's allegations do not allege actionable tort or Title IX claims.[12] Plaintiffs do not address this specific argument in their response brief. Jane Doe 9, unlike the other Plaintiffs, does not allege that she experienced a specific instance of assault or harassment. Instead, she alleges that she accompanied friends who reported sexual assaults to MSM and observed that the reports were ignored. Sec. Am. Compl. ¶¶ 441-443. She also alleges that she "experienced body shaming, double standards between boys and girls, and girls being slut-shamed, victim blamed, and treated as a temptation for boys." *Id.* ¶ 444. Her remaining allegations concern conduct that occurred after she graduated from MSM. *Id.* ¶¶ 445-450.

Although Jane Doe 9's allegations that she repeatedly observed MSM administrators downplaying or ignoring reports of sexual assault are troubling, the alleged conduct was not directed at Jane Doe 9. Jane Doe 9 provides no explanation as to how MSM's alleged failure to respond appropriately to another student's report could form the basis of a tort or Title IX claim for Jane Doe 9. But even assuming that it could, Jane Doe 9 has not included factual allegations plausibly showing that she suffered any actionable

---

[12] The Archdiocese also argues that Jane Doe 8's allegations are meritless. For the reasons stated in part B(3), Jane Doe 8 has failed to state a claim for intentional infliction of emotional distress. However, as discussed in parts B(4) and B(5), the Court does not find the arguments with respect to Jane Doe 8's negligence and Title IX claims persuasive.

injury. Unlike with the other Plaintiffs, Jane Doe 9 does not allege that MSM's conduct deprived her of equal access to educational benefits. Nor has she alleged any severe emotional distress or other injury that might give rise to a negligence or other claim. For those reasons, Jane Doe 9 has failed to state any plausible tort or Title IX claims.

## C. Statute of Limitations

Defendants contend that, apart from any other pleading deficiencies, certain claims brought by Jane Does 3, 4, 5, 6, 8, 9, 10, 15 and 16 are barred by the statute of limitations. Plaintiffs assert that their claims are timely, either because they did not accrue until the 2021 media story uncovered the widespread nature of the sexual harassment occurring at MSM or because the limitations period has been tolled.

Plaintiffs' Title IX claims are governed by Oklahoma's two-year statute of limitations. *See Varnell v. Dora Consol. Sch. Dist.*, 756 F.3d 1208, 1213 (10th Cir. 2014) (explaining that Title IX claims are governed by the states statute of limitation for personal injury); Okla. Stat. tit. 12, § 95(3) (setting out two-year limitations period). Although state law supplies the applicable limitations period for filing a Title IX claim, "federal law governs the question of accrual of federal causes of action, and thus, dictates when the statute of limitations begins to run." *Smith v. City of Enid By & Through Enid City Comm'n*, 149 F.3d 1151, 1154 (10th Cir. 1998). In general, federal law on the accrual of a cause of action conforms "to common-law tort principles." *Herrera v. City of Espanola*, 32 F.4th 980, 990 (10th Cir. 2022) (quotation omitted). "Under those principles, it is the standard rule that accrual occurs when the plaintiff has a complete and present cause of action, that is, when the plaintiff can file suit and obtain relief." *Id.* (quotation omitted).

However, in some instances, the "discovery rule" can "delay[] accrual of a claim until the plaintiff knew or should have known the facts necessary to establish her cause of action, such as the fact that a surgeon left a sponge in the plaintiff's abdomen after an operation." *Varnell v. Dora Consol. Sch. Dist.*, 756 F.3d 1208, 1216 (10th Cir. 2014). Importantly, the necessary facts include "the existence and cause of the injury which is the basis of [the] action." *Alexander v. Oklahoma*, 382 F.3d 1206, 1216 (10th Cir. 2004) (quoting *Indus. Constructors Corp. v. United States Bureau of Reclamation*, 15 F.3d 963, 969 (10th Cir.1994)); *see also Bradley v. U.S. by Veterans Admin.,* 951 F.2d 268, 270 (10th Cir. 1991) ("The Supreme Court has held that a claim 'accrues' for purposes of the two-year limitation, when the plaintiff knows both the existence and the cause of the injury.").

The focus of the discovery rule is "whether the plaintiff knew of facts that would put a reasonable person on notice that wrongful conduct caused the harm." *Alexander* 382 F.3d at 1216. Under this standard, "a plaintiff need not have conclusive evidence of the cause of an injury" or "detailed knowledge of the level of culpability of each of the actors involved" in order to trigger the statute of limitations. *Id.* Further, "a plaintiff must use reasonable diligence in seeking to discover facts giving rise to a claim for relief." *Id.* With respect to the state law claims, Oklahoma follows a similar principle: "[a] cause of action accrues when the injury occurs[,]" however "the discovery rule allow[s] limitations in certain tort cases to be tolled until the injured party knows or, in the exercise of reasonable diligence, should have known of the injury." *Calvert v. Swinford*, 382 P.3d 1028, 1033 (Okla. 2016).

Other tolling provisions may also impact the statute of limitations. Where the limitations period for a federal claim is borrowed from state law, the state's "generally applicable tolling provisions—such as those based on minority, incapacity, and equitable grounds" are also borrowed. *Varnell*, 756 F.3d at 1213. Pertinent here, Oklahoma has a statute permitting a person under any legal disability, such as minority, to bring an action within one year after the disability is removed. Okla. Stat. tit. 12, § 96; *see also Alexander,* 382 F.3d at 1217. Oklahoma also recognizes that the statute of limitations may be tolled under certain equitable principles, such as where "defendants engage in false, fraudulent or misleading conduct calculated to lull plaintiffs into sitting on their rights." *Id.* (quotation omitted).

Finally, in considering the timeliness issues surrounding Plaintiffs' claims, the Court is mindful that "the statute of limitations is an affirmative defense" that "typically" requires factual development to support dismissal. *Herrera v. City of Espanola*, 32 F.4th 980, 991 (10th Cir. 2022). "To obtain dismissal at the Rule 12(b)(6) stage based on the statute of limitations, the allegations on the face of the complaint surrounding the date of accrual must make clear that the right sued upon has been extinguished." *Id.* (quotation omitted). If "the dates given in the complaint make clear that the right sued upon has been extinguished, the plaintiff has the burden of establishing a factual basis for tolling the statute." *Aldrich v. McCulloch Properties, Inc.*, 627 F.2d 1036, 1041 (10th Cir. 1980). However, "[t]he question of whether a plaintiff should have discovered the basis of his suit under the doctrine of equitable tolling does not lend itself to determination as a matter of law." *Id.* at 1042. Thus, at the motion to dismiss stage, a "plaintiffs' allegations, asserting

affirmative conduct to conceal the fraud, are sufficient to invoke the doctrine of equitable tolling." *Id.*; *see also Watkins v. Cent. State Griffin Mem'l Hosp.*, 377 P.3d 124, 132 (Okla. 2016) ("Whether a plaintiff has used diligence in the pursuit of a claim or when a plaintiff as a reasonably prudent person knew or should have known of a claim is a question to be resolved by the trier of fact considering the unique facts and circumstances.").

### 1. Tolling for Minority Status

Plaintiffs initially argue that resolving Defendants' statute of limitations defense at this stage is not appropriate because the allegations do not make clear that the right sued upon has been extinguished. Relying on Oklahoma's general tolling provision, Okla. Stat. tit. 12, § 95(3), Plaintiffs contend that, because the alleged injuries occurred while they were minors, they have until their 19th birthday to assert their claims, but these dates cannot be determined on the face of complaint. As a general proposition, the Court does not find this argument persuasive.

The Second Amended Complaint details the dates each Plaintiff attended MSM and the year that each Plaintiff was allegedly harassed or assaulted. Although the age or date of birth of each Plaintiff is not alleged, the only reasonable conclusion is that Plaintiffs turned 18 within one year of graduating from high school (if not before). Plaintiffs do not explain why their dates of attendance cannot be used to calculate the applicable statute of limitations or why the favorable inference that they turned 18 no later than one year after leaving MSM is not warranted. Although the Court recognizes that the statute of limitations is an affirmative defense that a plaintiff is not generally required to plead around, the dates provided in the Second Amended Complaint make clear when the pertinent acts occurred

and permit a calculation that Plaintiffs reached the age of majority within a certain time frame.

### 2. Timeliness of Title IX Claims

The Tenth Circuit has recognized that Title IX claims can be premised on a funding recipient's deliberate indifference to *prior* reports of sexual harassment or its deliberate indifference *after* the plaintiff has reported sexual harassment. *Farmer*, 918 F.3d at 1097. *See also Doe v. Bd. of Trustees of Sublette Cnty. Sch. Dist. No. 9,* No. 23-8001, 2024 WL 1085149, at *6 (10th Cir. Mar. 13, 2024) (unpublished) (noting that there "differences between 'pre-assault heightened risk' and 'post-assault' deliberate indifference claims). Generally, "[a] post-assault claim alleges that a school's response to a complaint of sexual misconduct violated Title IX; a pre-assault claim alleges that the school maintained a policy of deliberate indifference to sexual harassment that created a heightened risk of it and, ultimately, led to a plaintiff's particular harassment." *Karasek v. Regents of Univ. of California*, 500 F. Supp. 3d 967, 970 (N.D. Cal. 2020). Here, Plaintiffs allege "both a pre-assault and post-assault claim" under Title IX based on "the Defendants failure to take the appropriate precautionary measures, their failure to protect, their failure to investigate allegations and their failure to remedy the risk." Sec. Am. Compl. ¶¶ 321, 672.

### a. Post-assault claims

Defendants argue that, given the dates of assault and dates of attendance included in the Second Amended Complaint, the post-assault Title IX claims asserted by Jane Does 3, 5, 8, 10, and 15 are time barred. Plaintiffs counter that their claims did not accrue until

they learned of MSM's deliberate indifference towards sexual assault occurring at the school, which MSM actively concealed.

In *Varnell v. Dora Consol. Sch. Dist.*, 756 F.3d 1208, 1215 (10th Cir. 2014), the Tenth Circuit specifically considered the date of accrual of a post-assault Title IX claim. *See also Sublette Cnty.*, 2024 WL 1085149, at *6 (explaining that "*Varnell* provides the rule of law as to the accrual of post-assault deliberate indifference claims"). After analogizing a post-assault claim to the common law tort of battery, the Tenth Circuit held that the claim accrued "not later than the last sexual abuse" and that the plaintiff's failure to understand the full extent of her injury did not delay the accrual date. *Id.* at 1215-1216.

*Varnell's* holding compels the conclusion that the post-assault Title IX claims asserted by Jane Does 3, 5, 8, 10, and 15 are time barred. These Plaintiffs make the following allegations regarding the abuse or harassment they experienced:

- Jane Doe 3 alleges that she was assaulted by student S.L. during her sophomore year, the assault was reported to MSM, and there were no consequences for S.L. She graduated in 2017. Sec. Am. Compl. ¶¶ 392-404.

- Jane Doe 5 alleges that she attended MSM from 2014-2018, she experienced several separate incidents of sexual harassment or assault, and MSM did not take any action in response to her reports. *Id.* ¶¶ 408-420.

- Jane Doe 8 alleges that she was assaulted by a coach during her senior year, MSM administrators were told of the incident, and MSM responded inappropriately and inadequately, including by making Jane Doe 8 apologize. She attended MSM from 2016-2019. *Id.* ¶¶ 432-437.

- Jane Doe 10 alleges that she was repeatedly assaulted and harassed during her sophomore year, MSM did nothing to stop the conduct, and MSM retaliated against Jane Doe 10 by blocking her admission into the National Honor Society. She attended MSM from 2016-2019. *Id.* ¶¶ 452-463.

- Jane Doe 15 alleges that she was raped at an off-campus location by a student during her freshman year, her mother (Jane Doe 16) reported the rape to the MSM principal, the principal threatened Jane Doe 15 with losing her scholarship if she continued to speak about the incident, and MSM did not conduct an investigation or punish the assailant. She attended MSM from 2004-2006. *Id.* ¶¶ 482-490.

Plaintiffs also allege that they were being "constantly exposed" to potential encounters with their alleged harassers. *Id*. at ¶¶ 308 326. Pursuant to *Varnell*, the post-assault claims of these Plaintiffs accrued not later than the last instance of abuse or harassment. These accrual dates occurred more than three years prior to filing of this lawsuit in 2022 and, even accounting for a one-year tolling period based on Plaintiffs' minority, fall outside the two-year statute of limitations.

To avoid this time bar, Plaintiffs argue that the accrual date should be delayed or the limitations period tolled based on MSM's concealment of its wrongdoing. They point to allegations stating that MSM misled girls who reported sexual assault into believing they were isolated incidents, misled Plaintiffs as to MSM's policies, told Plaintiffs that sexual assault complaints would be referred for investigation when in fact they were not, and misled Plaintiffs into believing they were not abused. But even so, Plaintiff's allegations make clear that they "knew or should have known the facts necessary to establish" a post-assault Title IX claim. *Varnell*, 756 F.3d at 1216. Jane Does 3, 5, 8, 10, and 15 each allege that they had knowledge of their abuser's identity, had knowledge of his continued presence at the school, and had knowledge that MSM responded inappropriately to their report of misconduct. These allegations indicate that Plaintiffs knew of their injury and the general cause of their post-assault injury. *See Alexander*, 382 F. 3d at 1216. Further, to the

extent Plaintiffs allege that MSM blamed them for the incidents or told them they were not abused, the individual allegations of Jane Does 3, 5, 8, 10, and 15 indicate that they knew they had been subjected to misconduct. *See Varnell*, 756 F.3d at 1216 (rejecting assertion that a failure to understand the full extent of the injury delays accrual).

Given *Varnell's* holding as to the date of accrual of a post-assault Title IX claim, and the allegations by Jane Does 3, 5, 8, 10 and 15 regarding the date of the harassment and their knowledge of MSM's inadequate response to their report of harassment, the Second Amended Complaint makes clear that these post-assault Title IX claims are barred by the two-year statute of limitations. Accordingly, the post-assault Title IX claims asserted by Jane Does 3, 5, 8, 10 and 15 are dismissed with prejudice.[13]

### b. Pre-assault claims

Defendants next argue that the pre-assault Title IX claims asserted by Jane Does 3, 5, 6, 10 and 15 are time barred for essentially the same reasons as their post-assault claims. Because a pre-assault claim focuses on a school's inadequate response to other reports of sexual misconduct, as opposed to the mishandling of the plaintiff's own report of harassment, some courts have found "that a pre-assault heightened-risk claim may not

---

[13] Jane Doe 10's retaliation claim is similarly time barred. A Title IX retaliation claim requires showing that the defendant took a materially adverse action against the plaintiff because she complained of discrimination or harassment. *Jackson*, 544 U.S. at 184. Jane Doe 10 alleges that she was repeatedly sexually harassed during 2017-2018, she reported the misconduct to MSM in September or October 2017, and following the complaint, MSM retaliated against her by blocking her admission into the National Honor Society. Thus, even if MSM misled her regarding other sexual assaults or its own policies, Jane Doe 10 had all the facts necessary to assert her retaliation claim more than two years before filing this action, and more than a year after she left MSM.

accrue until well after a post-assault Title IX claim." *Snyder-Hill v. Ohio State Univ.*, 48 F.4th 686, 704 (6th Cir. 2022). Further, as previously noted, the Tenth Circuit has recognized that there are differences between a pre- and post-assault Title IX claim.

Here, Plaintiffs' pre-assault Title IX claim is premised on their allegation that "MSM displayed deliberate indifference to the safety of women and girls at the school, creating a heightened risk of sexual harassment and assault" by failing to investigate or correct the ongoing pattern of misconduct, overtly supporting misconduct by boys, and suppressing reports of assault. Sec. Am. Compl. ¶¶ 156, 328-329. Plaintiffs argue this pre-assault claim is not time-barred because MSM's intentional concealment of its wrongdoing prevented Plaintiffs from discovering MSM's role in causing their injuries.

In considering whether these claims are amenable to dismissal on the basis of the statute of limitations, the Court first notes that the Second Amended Complaint includes allegations showing that MSM knew of sexual misconduct occurring at the school and failed to take appropriate action:

- "Throughout the time DeNegri was the President and Principal of MSM, the Student Plaintiffs and dozens of other women and girls within the MSM community, reported assault, rape, and harassment, by boys and men at MSM (including MSM teachers and coaches), to MSM Teachers, Staff and Administrators including to DeNegri, but were ignored, shamed, disbelieved, and gaslit." Sec. Am. Compl. ¶ 140.

- "Allegations by other individuals not named herein were reported to DeNegri and MSM both before and after the allegations made by these Plaintiffs." *Id.* ¶ 141.

- "Each time the sexual assault allegations were reported to the Administration at MSM, the allegations were minimized, the by Talita DeNegri and her staff, the young women were blamed for the assault and/or accused of making up the allegations, they were called liars, made to apology, and their futures were threatened." *Id.* ¶ 142.

44

- "Talita DeNegri did not initiate a Title IX investigation in response to any allegation of the Plaintiffs or of the other students who reported abuse, harassment and assault." *Id.* ¶ 145.

- It was well known by MSM administrators that several male students assaulted or harassed multiple female students but MSM took no actions in response. *Id.* ¶¶ 289-290, 297-98.

- It was well known by MSM administrators that teachers and coaches frequently harassed students, including by making inappropriate comments about girls' bodies or physically assaulting students but MSM took no actions in response. *Id.* ¶¶ 303-306.

- An investigator hired by MSM told certain MSM families that the "school was breeding predators," "MSM covered up multiple felonies and broke the law," and "all allegations were swept under the rug." Further, the Archdiocese and MSM issued statements acknowledging that an independent investigation revealed that MSM failed to take action in response to reported allegations of sexual harassment and assault by students against other students. *Id.* ¶¶ 332-333; 635-641; p. 2.

- MSM settled a 2011 lawsuit involving allegations that a student was raped by another student but MSM did nothing to change its policies after the lawsuit. *Id.* ¶¶ 334-338.

The pleading also alleges numerous ways in which MSM "fosters and perpetuates a culture of shame" that values boys over girls, including by applying their dress code in a discriminatory manner or requiring girls to attend "morality day assemblies." *Id.* ¶¶ 273-282.

The Court next notes that the Second Amended Complaint includes allegations suggesting that MSM's administrators actively concealed certain facts or misled Plaintiffs regarding the extent of the abuse occurring at the school:

- MSM discouraged Plaintiffs from reporting abuse and threatened their education, the education of their siblings, parental employment, sports

participation, scholarship opportunity, and church involvement. *Id.* ¶¶ 154, 370, 400, 545.

- MSM's principal told the student Plaintiffs that sexual assault complaints would be referred to the Sisters of Mercy and the Archdiocese for investigation when in fact she never reported the complaints. *Id.* ¶¶ 302, 342.

- When reports of sexual harassment or assault were made, the victims were told that they were not abused and the student Plaintiffs believed they were not the victims of abuse. *Id.* ¶¶ 330, 533, 542, 574, 552, 554.

- MSM claimed they were subject to Title IX and followed Title IX procedures but never intended to or followed Title IX procedures. *Id.* ¶¶ 151-52.

- Each Plaintiff was told by MSM's principal that the staff had the knowledge, education, and experience to prevent sexual abuse and MSM misled Plaintiffs into believing that MSM followed certain training programs or policies designed to prevent sexual abuse. *Id.* ¶¶ 543, 553, 699.

- MSM kept a prior lawsuit against it based on the sexual assault of a student secret and kept the allegations of each Plaintiff secret. *Id.* ¶ 338.

- MSM's principal led girls who reported sexual assault or harassment to believe they were the only ones who experienced this type of misconduct. *Id.* ¶ 364.

- The students Plaintiffs did not know that other students had reported or would report similar incidents of sexual harassment and believed their own assaults were isolated incidents. *Id.* ¶¶ 368, 375, 405-406, 419, 495-97, 548-49.

- MSM constructively discharged a teacher that reported a student on student sexual assault. *Id.* ¶ 354.

Relying on these allegations, Plaintiffs assert that they were prevented from discovering their causes of action until the 2021 investigation and media story revealed the extent of the sexual misconduct occurring at MSM as well as MSM's deliberate indifference to multiple known acts of sexual assault and harassment. ¶¶ 373.

Construed in their favor, Plaintiffs' allegations assert a factually plausible basis for tolling the statute of limitations with respect to their pre-assault claims. The allegations indicate that they had some knowledge of MSM's discriminatory practices and were aware that MSM mishandled their own report of sexual harassment. However, the allegations also indicate that MSM actively concealed facts that are pertinent to their pre-assault claims. More specifically, Plaintiffs have alleged that MSM misrepresented that their report of harassment was an isolated incident, threatened them if they pursued the reports, and misled them into believing that MSM complied with training programs or policies designed to prevent sexual abuse. Further, the allegations indicate that MSM's own investigator concluded that MSM "covered up" multiple felonies. These allegations raise a plausible inference that MSM engaged in "false, fraudulent or misleading conduct or some affirmative act of concealment to exclude suspicion and preclude inquiry." *See Jarvis v. City of Stillwater*, 732 P.2d 470, 473 (Okla. 1987). Further, these allegations suggest that even though Plaintiffs may have been aware that MSM mishandled their own reports, an investigation may not have revealed MSM's prior deliberate indifference because MSM affirmatively misrepresented both its policies and the extent of sexual harassment amongst its students. Ultimately, the Second Amended Complaint asserts a factually plausible basis for tolling the pre-assault claims and these issues are not amenable to dismissal at this stage of the proceedings.[14]

---

[14] Defendants note that some Plaintiffs have included allegations suggesting that they were aware of the "culture of shame" that MSM fostered or recognized that MSM would "protect the perpetrator" rather than the victim. Although these allegations indicate that Plaintiffs were aware of facts that would alert them to their post-assault claims, the Court is not

### 3. Timeliness of Negligence Claims

Defendants additionally argue that the negligence claims asserted by Jane Does 3, 5, 8, 10, and 15 are time barred.[15] In response, Plaintiffs first argue that, unlike their Title IX claim, which is governed by the two-year limitations period set out in Okla. Stat. tit. 12 § 95(3), their negligence claim is governed by the limitations period set out in Okla. Stat. tit. 12 § 95(6). This statute provides that

> [a]n action based on intentional conduct brought by any person for recovery of damages for injury suffered as a result of childhood sexual abuse incidents or exploitation as defined by Section 1-1-105 of Title 10A of the Oklahoma Statutes or incest against the actual perpetrator shall be commenced by the forty-fifth birthday of the alleged victim. If the person committing the act of sexual abuse against a child was employed by an institution, agency, firm, business, corporation or other public or private legal entity that owed a duty of care to the victim, or the accused and the child were engaged in some activity over which the legal entity had some degree of responsibility or control, the action must be brought against such employer or legal entity within two (2) years; provided, that the time limit for commencement of an action pursuant to this paragraph is tolled for a child until the child reaches the age of eighteen (18) years.

If this statute is applicable to Plaintiffs' negligence claim, its longer tolling period would complicate the ability to determine from the face of pleading whether the claims were time

---

persuaded that these allegations necessarily foreclose the equitable tolling of their pre-assault claims. Plaintiffs' pre-assault claim is not only based on MSM's culture of shaming girls or discouraging reporting, but also its alleged knowledge of and failure to respond to numerous other instances of sexual assault. Sec. Am. Compl. ¶ 156. Even if Plaintiffs had some awareness of MSM's alleged culture of shame, and were aware that MSM failed to respond appropriately to their own report of assault, Plaintiffs have also alleged that they were intentionally misled about MSM's deliberate indifference to numerous other reports of sexual harassment and assault.

[15] MSM also contends the negligence claims asserted by Jane Does 4 and 16 (parents of two student plaintiffs) are time barred. However, it is not clear that these parent plaintiffs are asserting a negligence claim. Sec. Am. Compl. ¶¶ 171, 175.

barred because some plaintiffs, such as Jane Does 8 and 10, may not have turned 18 more than two years before filing suit. Defendants do not respond to Plaintiffs' argument that this statute provides the correct limitations period for their negligence claim.

In any event, Plaintiffs have plausibly alleged a basis for tolling the statute of limitations with respect to their negligence claim. The negligence claim is premised on MSM's failure to provide a safe campus environment and failure to properly train and supervise its employees regarding recognizing and responding to sexual misconduct. Sec. Am. Compl. ¶¶ 590, 593, 611-14. As previously noted, Plaintiffs have alleged that MSM intentionally misled them regarding MSM's training programs and policies, MSM staff's knowledge and experience in responding to sexual misconduct, and prior reports of misconduct. *Id.* ¶¶ 364, 543, 553, 699. These allegations raise a plausible inference that MSM engaged in misleading conduct with respect to facts that were material to Plaintiffs' claims. *See Watkins v. Cent. State Griffin Mem'l Hosp.,* 377 P.3d 124, 132 (Okla. 2016) (evidence that defendants gave plaintiff false information raises fact question regarding whether limitations period should be tolled). Given these allegations, the Court is not persuaded that it can conclude as a matter of law at this early stage that the negligence claims of Jane Does 3, 5, 8, 10 and 15 are time barred.[16]

---

[16] Because Jane Doe 3, 5, 8, and 10 have failed to state plausible claims for intentional infliction of emotional distress and fraudulent inducement to contract, there is no need to address whether these claims are barred by the statute of limitations. Jane Doe 15 is addressed in part C(4).

### 4. Jane Doe 15's Contract Claim

MSM's final timeliness argument concerns Jane Doe 15's breach of contract claim. MSM argues that this claim, which is subject to a five-year limitations period, *see* Okla. Stat. tit. § 95(A)(1), accrued at the latest in 2006, when she left MSM.

Under Oklahoma law, a breach of contract claim "accrues when the contract is breached, regardless of whether the plaintiff knows, or in the exercise of reasonable diligence, should have known of the breach." *Morgan v. State Farm Mut. Auto. Ins. Co.*, 488 P.3d 743, 753 (Okla. 2021). Although the discovery rule does not apply to a breach of contract action, the limitations period can nevertheless be tolled "[i]f a defendant fraudulently conceals material facts and thereby prevents a plaintiff from discovering his wrong or the fact that a cause of action has accrued against him." *Id.*

Plaintiffs' breach of contract claim is premised on MSM's alleged promises to not tolerate sexual harassment, investigate complaints, and comply with Title IX. Jane Doe 15 alleges that after she reported being raped by another student, MSM's principal did nothing to investigate the incident, threatened Jane Doe 15 with losing her scholarship if she continued to discuss it, and that it was clear to her that MSM would protect the perpetrator. These allegations indicate that she had knowledge that MSM mishandled her own report of harassment and did not properly investigate her complaint or comply with Title IX. Even if MSM misled her about the extent of abuse occurring at the school or its policies and procedures, her allegations indicate that she had knowledge of the material facts necessary

to assert her breach of contract claim well before she initiated this lawsuit.[17] Accordingly, this claim is barred by the statute of limitations.

### D. Sexual Abuse Claim against Defendant DeNegri

The Second Amended Complaint includes a claim by Jane Doe 8 for "civil sexual abuse" against Talita DeNegri, MSM's principal during the time of the alleged events. Jane Doe 8 alleges that she was sexually assaulted by a coach while she was a student at MSM and that Ms. DeNegri is an "actual perpetrator of sexual abuse" as set forth in Okla. Stat. tit. 10A, § 1-1-105. Ms. DeNegri moves for dismissal, contending that the allegations are insufficient to state a claim.

Section 1-1-105(2) of title 10A is part of the Oklahoma Children's Code, a set of statutes intended "to provide the foundation and process for state intervention into the parent-child relationship." Okla. Stat. tit. 10A, § 1-1-102(B). The statute defines "abuse" as "harm or threatened harm to the health, safety, or welfare of a child by a person responsible for the child's health, safety, or welfare, including but not limited to nonaccidental physical or mental injury, sexual abuse, or sexual exploitation." *Id.* at § 1-1-105(2). Jane Doe 8 relies on this definition to argue that Ms. DeNegri is a person responsible for a child's safety and is therefore liable as a perpetrator of sexual abuse for the alleged sexual assault that was committed by the MSM coach.

---

[17] For the same reason, the Court concludes that Jane Doe 15's intentional infliction of emotional distress claim is time barred. Jane Doe 15 alleges that she experienced extreme emotional distress after she was raped and MSM chose not to investigate the incident. Sec. Am. Compl. ¶ 494. The allegations indicate that Jane Doe 15 knew of her injury and its general cause well before the limitations period expired.

A "person responsible for a child's health, safety, or welfare" is defined by the statute as including

> a parent; a legal guardian; custodian; a foster parent; a person eighteen (18) years of age or older with whom the child's parent cohabitates or any other adult residing in the home of the child; an agent or employee of a public or private residential home, institution, facility or day treatment program as defined in Section 175.20 of Title 10 of the Oklahoma Statutes; or an owner, operator, or employee of a child care facility as defined by Section 402 of Title 10 of the Oklahoma Statutes;….

*Id.* at § 1-1-105(53). Ms. DeNegri does not fall into any of these categories merely because she was the principal of the school where the alleged assault occurred. *See M.C. v. Hollis Indep. Sch. Dist. No. 66 of Harmon Cnty*, No. CIV-15-343-C, 2017 WL 1102680, at *5 (W.D. Okla. Mar. 23, 2017) (finding that teacher, principal and superintendent were not persons responsible for a child's health, safety or welfare as defined by the Oklahoma Children's Code).

In arguing otherwise, Jane Doe 8 relies on Okla. Stat. tit. 10A, § 1-6-105(5), which broadens the definition of "person responsible for a child" to include "any person who has voluntarily accepted the duty of supervising a child." However, this statute concerns the disclosure of child records and does not apply to the circumstances presented here. Jane Does 8 also relies on case law discussing a school district's duty to protect students from the conduct of third parties while in the custody of the school. But these cases concern a school official's liability for their own negligence; they do not discuss whether a school official may be held liable as an actual perpetrator of sexual abuse where the school official did not herself commit the alleged sexual assault. Jane Doe 8 has not shown that she may maintain a civil claim for sexual abuse in the way she advances here.

Accordingly, the claim for intentional civil sexual abuse asserted against Ms. DeNegri is dismissed with prejudice.

## CONCLUSION

As set out above, Defendants' Motions to Dismiss [Doc. Nos. 66, 67, 68] are GRANTED in part and DENIED in part. The following claims are dismissed with prejudice:[18] fraudulent inducement to contract claim asserted by all Plaintiffs against all Defendants; intentional infliction of emotional distress claims asserted by Jane Does 3, 5, 6, 8, 10, and 17 against all Defendants; tort and Title IX claims asserted by Jane Doe 9 against all Defendants; post-assault Title IX claims asserted by Jane Dos 3, 5, 8, 10, and 15, against MSM; breach of contract and IIED claim asserted by Jane Doe 15; civil sexual abuse claim asserted by Jane Doe 8 against Defendant DeNegri; negligence, intentional infliction of emotional distress, and breach of contract claims asserted directly against the Archdiocese and Sisters of Mercy. Plaintiffs' claim for breach of the duty of good faith and fair dealing is dismissed without prejudice.

IT IS SO ORDERED this 13th day of February, 2025.

DAVID L. RUSSELL
UNITED STATES DISTRICT JUDGE

---

[18] Defendants seek dismissal of certain claims with prejudice. Plaintiffs have had multiple opportunities to amend their pleading to state plausible claims, their current pleading is highly detailed, and they do not request leave to further amend in the event any of their claims are found deficient. Under these circumstances, a dismissal with prejudice is appropriate. *See Brereton v. Bountiful City Corp.*, 434 F.3d 1213, 1219 (10th Cir. 2006) ("A dismissal with prejudice is appropriate where a complaint fails to state a claim under Rule 12(b)(6) and granting leave to amend would be futile."); *Frank v. U.S. West*, 3 F.3d 1357, 1365 (10th Cir. 1993) (noting that a "failure to cure deficiencies by amendments previously allowed" can justify refusing leave to amend).